```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
NATHANIEL MYERS,                         :
                    Plaintiff,           :
                                         :
            -v-                          :   09 Civ. 4436 (DLC)
                                         :
COMMISSIONER MARTHA K. HIRST and         :   OPINION AND ORDER
NEW YORK CITY DEPARTMENT OF CITYWIDE     :
ADMINISTRATIVE SERVICES,                 :
                    Defendants.          :
                                         :
---------------------------------------- X
```

APPEARANCES:

For Plaintiff:
David M. Fish
3 Park Avenue, 28th Floor
New York, NY 10016

For Defendants:
Jessica L. Miller
Assistant Corporation Counsel
100 Church Street, Rm. 2-316
New York, NY 10007

DENISE COTE, District Judge:

Plaintiff Nathaniel Myers, who was formerly employed as a Chauffeur-Attendant by the New York City Department of Citywide Administrative Services ("DCAS"), brings this lawsuit under 42 U.S.C. § 1983 and New York City Human Rights Law ("CHRL"), § 8-107 of Chapter 1 of Title 8 of the Administrative Code of the City of New York, alleging deprivation of due process, discrimination in violation of the Equal Protection Clause, and discrimination based upon a perceived disability or history of a

disability.[1]  On July 15, 2010, the defendants moved for summary judgment on all claims.  For the following reasons, the motion is granted.

## BACKGROUND

The following facts are undisputed or are presented in the light most favorable to the plaintiff.  Myers is an African-American male who began employment with the City of New York at the Mayor's Office in the early 1990s, and was reassigned to the Department of General Services ("DGS"), the predecessor agency to DCAS, to work as a Chauffeur-Attendant in 1993.  As a Chauffeur-Attendant, he was "responsible for chauffeuring high-level and elected City Hall officials to and from various work locations."  The DGS job description states that a Chauffeur-Attendant's "[d]uties require complete trustworthiness."  Myers was not a union member and the position of Chauffeur-Attendant is an "exempt class" within the civil service.

A. 2005 and 2008 DCAS Controlled Substance and Alcohol Use Testing Policy and Procedure

On June 1, 2005, DCAS issued a Controlled Substance and Alcohol Use Testing Policy and Procedure ("2005 Policy"), which

---

[1] The Second Amended Complaint filed on July 15, 2010 is the operative complaint in this matter.  It also states claims pursuant to both 42 U.S.C. § 1981 and the Administrative Code of New York, § 8-107, Chapter 1, Title 8 for race discrimination due to the use of an allegedly racially discriminatory drug testing procedure.  Myers has withdrawn his claims based on race discrimination.

stated a "zero-tolerance" for the illegal use of controlled substances and the misuse of alcohol.  On June 3, 2005, Myers signed a "Receipt/Acknowledgment Form" indicating that he received the 2005 Policy.  The 2005 Policy warns that chauffeurs "shall be terminated" if they are "found to have engaged in prohibited conduct."  Rule 2.2.2 of the policy prohibits the "unauthorized use or possession of controlled substances," which includes "[c]ocaine metabolites; that is, cocaine and its derivatives."

Pursuant to the 2005 Policy employees were required to submit to drug testing as part of:  (1) "[p]re-employment testing,"; (2) "Reasonable Suspicion testing"; "Post-Accident testing"; and, (4) "Random testing for controlled substance and/or alcohol use: conducted on a random unannounced basis."  Finally, Rule 4.0.0 establishes procedures for urine testing.  It provides, in relevant part:

> Upon collection, each urine sample will be subdivided into two bottles: one labeled "A" and one labeled "B."  The collector will seal and label both samples and complete a chain of custody form.
>
> The sample labeled "A" and all accompanying documentation will be shipped by the testing facility to a controlled substance laboratory ("laboratory").  The analysis will be performed by a laboratory that is certified and monitored by the federal Department of Health and Human Services ("DHHS").
>
> The sample labeled "B" will remain sealed and stored at the testing facility.  (<u>In the event the sample labeled "A" is confirmed as positive for the</u>

> presence of illegal controlled substances, the Chauffeur has 72 hours to request that the sample labeled "B" be sent to another laboratory for analysis at his or her own expense . . . .)
>
> [A] Chauffeur has 72 hours from the confirmation of a positive result to request that his or her sample labeled "B" be delivered to a second DHHS-certified laboratory.  The cost of any delivery charges and analysis is at the Chauffeur's own expense.

(Emphasis supplied).

Approximately three years later, on June 6, 2008, DCAS issued an updated Controlled Substance and Alcohol Testing Policy and Procedure ("2008 Policy") to "reflect enhanced testing methods."  The same day, Myers signed a form indicating that he had received the 2008 Policy.  The 2008 Policy differed from the 2005 Policy in one respect that is material to this litigation:  the 2008 Policy provided for the testing of hair follicles in addition to urine.  Specifically, the 2008 Policy provides that

> If a hair sample is to be taken, the hair sample will be removed by a staff member at the collection site and sent to the laboratory that is certified and monitored by NYSDOH in order to conduct the proper testing for said hair sample.  The proper chain of custody will be maintained by the laboratory while the sample is sent to the laboratory.  The same stages for testing urine samples will be applied to hair samples.

(Emphasis supplied).  Since the institution of the 2005 Policy, Myers had never been randomly tested for the use of alcohol or a controlled substance.

B. Myers's Admission of Use of Cocaine and Entrance into Treatment

From approximately February 2007 through March of 2008, while Myers's mother was ill and following her death, the plaintiff used cocaine "as needed."  Soon after he received the 2008 Policy, Myers spoke with his supervisor "to find out why or how an individual who wants to come forward that may have a problem, how does -- how do they address that."  After the discussion with his supervisor, Myers met with the Deputy Commissioner of DCAS and told him he was having a problem with cocaine.  Plaintiff then took medical leave and began an outpatient drug treatment program with Inter-Care.  Although Myers testified in his deposition that the last time he used cocaine was in March 2008, Inter-Care records indicate that on June 27, at the time he entered treatment, Myers reported using cocaine as recently as June 6.

From June 30 through August 7, 2008, Myers participated in the Inter-Care program.  Throughout this period, Myers's urine was tested for drugs on a weekly basis and the result of each of these tests was negative.

C. The Notification Agreement and Myers's Return to Employment

By letter dated August 13, 2008, Dr. Bruce Lieberman of Inter-Care notified DCAS that Myers had "successfully completed the Intensive Outpatient program" and could "safely return to

full duty at his previous job as a motor vehicle driver."  On
August 18, 2008, Myers signed a Notification prepared by DCAS.
The Notification states that "on or about June 19, 2008, [Myers]
approached [his] supervisor and stated that, if [he] was
randomly tested on that date, [he] would test positive for a
controlled substance[,]" but "notwithstanding [this] admission
[of drug use], [Myers was] not . . . terminated from [his]
position as Chauffeur."[2]  The Notification next lays out a number
of "condition[s]" to which Myers was required to consent in
order to work as a Chauffeur.  Among other things, Myers agreed
"that, for one calendar year after [his] return to duty as
Chauffeur, [he would] be subject, while on duty, to no fewer
than twelve follow-up tests for unauthorized substances, the
timing of such tests to be entirely at the discretion of [his]
supervisors."  In addition to the twelve "follow-up tests," the
Notification specified that Myers's name would "remain in the
pool of names for selection for random tests for illegal
substances."

D. The November 3, 2008 Drug Test

     On November 3, 2008, Myers was instructed to report to the
office of Bendiner & Schlesinger, the agency's private

---

[2] Since Myers claims that the last time he used cocaine was in
March 2008, he denies that he told his supervisor in June that
"if [he] was randomly tested on that date, [he] would test
positive for a controlled substance."

laboratory facility, for a drug test by method of urine and hair analysis. Plaintiff's urine sample tested negative for the presence of a controlled substance. But the hair sample, which Bendiner & Schlesinger forwarded to Quest Diagnostics via Federal Express Mail, tested positive for the presence of cocaine metabolites. In order for a hair follicle to test positive for the presence of cocaine, Myers must have consumed cocaine within the previous 90 days. Myers, however, denies that he used cocaine at any time after March 2008.

E. The End of Myers's Employment at DCAS

By letter dated November 19, 2008, plaintiff was discharged from his employment as a DCAS Chauffeur-Attendant. The Deputy Commissioner of DCAS explained to Myers that his employment had been terminated based on his failure to comply with the Notification. Myers asserts that he was refused a copy of the test.

After his employment with DCAS was terminated, Myers applied for unemployment insurance. At a hearing to determine whether Myers was eligible for such benefits, DCAS only offered evidence regarding the chain of custody of the hair sample within the Bendiner & Schlesinger laboratory. An ALJ found that DCAS had failed to "establish a valid chain of custody for [Myers's] hair specimen after the technician sealed it and gave it to the secretary at the testing site for the delivery to the

7

laboratory for analysis."  Consequently, the ALJ found that there was "no act of misconduct on the claimant's part" and Myers's "employment ended under non-disqualifying conditions."  In support of their motion for summary judgment, the defendants have provided chain of custody evidence from both the laboratory where the sample was collected and where it was analyzed.

Plaintiff filed this action on May 8, 2009, an amended complaint on August 8, and a second amended complaint on December 8.  Following the completion of discovery, defendants filed a motion for summary judgment on July 15, 2010.  The motion was fully submitted on August 18.

## DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts "in the light most favorable" to the nonmoving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008).

When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must

"set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings.  Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist."  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only disputes over material facts --"facts that might affect the outcome of the suit under the governing law" -- will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

Plaintiff raises three claims.  Pursuant to 42 U.S.C. § 1983, he pleads violations of the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment.  The third claim is for discrimination based on a perceived disability in violation of § 8-107 of the CHLR.

1. Due Process Clause Claim

In reliance on the drug testing procedures in the 2008 Policy, Myers asserts that his rights under the Due Process Clause were violated when the defendants did not promptly give him a copy of the drug test results. He contends that this refusal to share the test results denied him an opportunity to request that a second laboratory confirm the agency's test results.

"To state a claim for deprivation of property without due process of law, a plaintiff must identify a property interest protected by the Due Process Clause." Harrington v. County of Suffolk, 607 F.3d 31, 34 (2d Cir. 2010). To establish a valid property interest, a plaintiff must "have a legitimate claim of entitlement" to that interest. McPherson v. New York City Dept. of Educ., 457 F.3d 211, 216 (2d Cir. 2006) (citing Bd. Of Regents of State Colls. v. Roth, 408 U.S. 564, 576 (1972)). "Such entitlements are not created by the Constitution but, rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." Harrington, 607 F.3d at 34 (quoting Town of Castle Rock v. Gonzales, 545 U.S. 748, 756 (2005)). "[F]ederal constitutional law," however, "determines whether [that independently-created] interest rises to the level of a

10

legitimate claim of entitlement protected by the Due Process Clause." Id. (quoting Castle Rock, 545 U.S. at 757).

"An interest that can be terminated at the whim of another person is not protected by the Due Process clause." McPherson, 457 F.3d at 216 (citation omitted). Since "at-will government employee[s] may be terminated for cause or for no cause whatsoever[,]" these employees do not have a property interest in their continued employment. Segal v. City of New York, 459 F.3d 207, 213 (2d Cir. 2006). See also Waters v. Churchill, 511 U.S. 661, 679 (1994) ("[A]n at-will . . . government employee generally has no claim based on the Constitution at all.").

New York subscribes to the "traditional American common-law rule . . . that employment for an indefinite or unspecified term is at will and may be freely terminated by either party at any time without cause or notice." Horn v. N.Y. Times, 100 N.Y.2d 85, 90-91 (2003). "This presumption [of at-will employment] can be rebutted . . . by establishing an express limitation in the individual contract of employment curtailing an employer's right to terminate at will." Baron v. Port. Auth. Of New York, 271 F.3d 81, 85 (2d Cir. 2001) (citation omitted).

To rebut the presumption of at-will employment by evidence of an employer's practices or policies, the plaintiff must prove that:

11

> (1) [A]n express written policy limiting the employer's right of discharge exists, (2) the employer (or one of its authorized representatives) made the employee aware of this policy, and (3) the employee detrimentally relied on the policy in accepting or continuing employment.

Id. (citation omitted).  Given this "explicit and difficult pleading burden," Sabetay v. Sterling Drug, Inc., 69 N.Y.2d 329, 334-35 (1987), New York courts have been reluctant to find that "[r]outinely issued employee manuals, handbooks and policy statements" have been "converted into binding employment agreements."  Lobosco v. N.Y. Tel. Co./NYNEX, 96 N.Y.2d 312, 317 (2001).

Under New York law, Myers was an at-will employee and did not have a property interest in his continued employment at DCAS.[3]  Myers acknowledges that since August 10, 1993, his position has been within the "exempt class of civil service." Myers did not have an employment contract giving him a right to his job for a definite period of time.  Additionally, there was no "express written policy limiting [his] employer's right of discharge."  Baron, 271 F.3d at 85.

---

[3] Since Myers has failed to identify a valid property interest, it is unnecessary to decide whether Myers was denied due process because DCAS fired him based on a false positive result that "lacked a proper chain of custody."  For the same reason, it is unnecessary to determine whether Myers was required to avail himself of the post-deprivation remedies available in state court.

Myers principally raises two arguments in opposition to this conclusion. First, Myers argues that the 2008 Policy constitutes an "express written policy limiting the right of discharge" upon which Myers "detrimentally relied." Nothing in the 2008 Policy, however, creates a limitation on DCAS's unfettered authority to fire its employees without cause. Rather, the policy puts employees on notice that their employment will be terminated if they are found to have used a prohibited substance.[4]

The cases on which Myers relies to support his contention that he was not an at-will employee are inapposite. For example, in Weiner v. McGraw-Hill, Inc., 57 N.Y.2d 458 (1982), the employee had been "assured" at the time he accepted the employment that he would not be fired without "just cause." Id. at 460. See also Gorrill v. Icelandair/Flugleidir, 761 F.2d 847, 850 (2d Cir. 1985) (employee had an employment contract for a "term of years" and employer conducted itself as if "rules and regulations in the Operations manual were binding"); Mycak v. Honeywell, Inc., 953 F.2d 798, 801-02 (2d Cir. 1992)( a "job security policy" in an employer's handbook "set[] forth a very

---

[4] This reading of the 2008 Policy is further supported by a provision which states that even if an employee has a second test conducted, the results of which "do[] not confirm a positive result for controlled substances," DCAS "may, in its discretion, reconsider its termination of the Chauffeur." (Emphasis supplied).

specific and detailed procedure for work force reduction in mandatory and unqualified terms").

Second, Myers contends that even if he did not have a property interest in his continued employment, he had a property interest in DCAS complying with the procedures outlined in the 2008 Policy. This argument fails since the plaintiff must demonstrate a property interest in the employment before he can claim a violation of his right to due process for the employer's failure to follow its written procedures. See Dist. Att'y's Office v. Osborne, 129 S. Ct. 2308, 2319 (2009)  Since Myers does not have a property interest in his continued employment with DCAS, he had no constitutionally protected right to the procedures outlined in the 2008 Policy for challenging an adverse drug test.

2. Equal Protection Clause Claim

Myers contends that he was denied the equal protection of the law since he was not treated the same as another Chauffeur-Attendant who tested positive for the use of an illegal controlled substance. The Equal Protection Clause of the Fourteenth Amendment "requires that the government treat all similarly situated people alike." Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir. 2005). Significantly, however, "the Equal Protection Clause does not apply to a public employee asserting a violation of the Clause based on a 'class of one'

14

theory of liability." Huth v. Haslun, 598 F.3d 70, 72 n.1 (2d Cir. 2010) (citation omitted). See also Engquist v. Or. Dept. of Agric., 553 U.S. 591, 606-07 (2008). Instead, in the public employment context, the Equal Protection Clause is only implicated when the "government makes class-based decisions . . . treating distinct groups of individuals categorically differently." Engquist, 553 at 605.

Myers alleges that he was treated differently from one other similarly situated Chauffeur-Attendant, to whom the parties refer as "J.P." J.P. failed a drug test but was permitted to execute a stipulation (which was similar to the Notification executed by Myers) and keep his job. DCAS explains that it wanted to give J.P. the second chance it had given Myers. While Myers contends that J.P. received more favorable treatment than he received, he does not contend that this disparity in treatment was due to class-based discrimination. As a result, this class-of-one equal protection claim must be dismissed.

3. Disability Claim

Finally, Myers asserts that DCAS terminated his employment based on a perceived disability -- his past drug problem -- in violation of CHRL § 8-107. CHRL § 8-107 provides, in relevant part, that it is an unlawful discriminatory practice for:

15

> an <u>employer</u> . . . <u>because of the actual or perceived</u> . . . <u>disability</u> . . . of any person, to refuse to hire or employ or to bar or <u>to discharge from employment</u> such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

N.Y. City Admin. Code § 8-107(1)(a) (2009) (emphasis supplied). The term "disability" is defined to encompass "any physical, medical, mental or psychological impairment, or a history or record of such impairment." <u>Id</u>. § 8-102(16)(a). The definition of a "disability" excludes individuals who are "currently engaging in the illegal use of drugs, when the covered [employer] acts on the basis of such use." <u>Id</u>. § 8-102(16)(c). Moreover, the CHRL provides that nothing in it "shall be construed to prohibit a covered [employer] from (i) prohibiting the illegal use of drugs . . . at the workplace or on duty impairment from the illegal use of drugs . . ., or (ii) conducting drug testing which is otherwise lawful." <u>Id</u>. § 8-107(15)(c). Finally, the General Regulations of the New York State Division of Human Rights provide that "[w]here the employer has knowledge of the current illegal use of drugs," meaning "use that occurred recently enough to justify a <u>reasonable belief</u> that a person's drug use is current or that continuing use is a real and ongoing problem," the employee is "not entitled by law to accommodation, and may be

16

terminated." N.Y. Comp. Codes R. & Regs. Tit. 9, § 466.11(h)(4)(i) (emphasis supplied); see also Iannone v. ING Fin. Servs., LLC, 853 N.Y.S.2d 339, 340 (N.Y. App. Div. 2008) (applying § 466.11(h) of the General Regulations of the New York State Division of Human Rights).

Myers was fired on the basis of the November 3 drug test indicating that he had used an illegal controlled substance within ninety days of that test. Plaintiff does not contest that illegal drug use within ninety days of the drug test would constitute "current" drug use or evidence of a "real and ongoing problem." Since current drug use is not a protected disability under the CHRL, Myers's discrimination claim must be dismissed. See Iannone, 853 N.Y.S.2d at 340.

Myers contends that he had not used illegal drugs since March 2008, and that the positive result from November 2008 must have been faulty. He does not dispute, however, that the laboratory gave DCAS a report reflecting that Myers had failed the November drug test. A positive drug test by a laboratory licensed to perform testing by the Department of Health and Human Services is a reasonable basis from which DCAS could conclude that Myers was still using drugs at the time he was

fired.[5]  Consequently, Myers's disability claim brought pursuant to the CHRL must be dismissed.

## CONCLUSION

The defendants July 15, 2010 motion for summary judgment is granted.  The Clerk of Court shall enter judgment for the defendants and close the case.

SO ORDERED:

Dated:     New York, New York
           January 13, 2011

                                       _____
                                            DENISE COTE
                                       United States District Judge

---

[5] Myers challenges the reasonableness of DCAS's belief by pointing to the ALJ's finding that DCAS failed to establish a proper chain of custody for the positive drug test at Myers's unemployment hearing and the fact that Myers was not properly notified, pursuant to the 2008 Policy, of his right to have a second hair sample tested.  As discussed above, DCAS provided additional chain of custody evidence in this litigation beyond what it submitted to the ALJ.  Myers does not raise a question of fact regarding the chain of custody evidence or the reliability of the testing protocol and therefore those issues do not prevent entry of summary judgment.  Finally, the procedures outlined in the 2008 Policy for employee-initiated testing do not amend the CHRL or restrict the defendants' ability to fire employees pursuant to the CHRL.